J-S54024-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| BRIAN GLEN WHITE | |
| Appellant | No. 133 MDA 2014 |

Appeal from the Judgment of Sentence December 13, 2013
In the Court of Common Pleas of Wyoming County
Criminal Division at No(s): CP-66-CR-0000127-2013

BEFORE:  LAZARUS, J., MUNDY, J., and STABILE, J.

MEMORANDUM BY MUNDY, J.:                    **FILED OCTOBER 10, 2014**

Appellant, Brian Glen White, appeals from the December 13, 2013 aggregate judgment of sentence of 72 hours to six months' imprisonment, to be followed by six months' probation, imposed after the trial court found him guilty of driving under the influence (DUI) – general impairment, DUI – highest rate of alcohol, and two counts of failure to drive within a single traffic lane.[1]  After careful review, we affirm.

The trial court has summarized the relevant factual and procedural history of this case as follows.

> [O]n December 1, 2012 Tunkhannock Police Officer Keith Carpenter (hereinafter "Carpenter") was on patrol duty for traffic enforcement and was dressed in full uniform in a marked Tunkhannock

---

[1] 75 Pa.C.S.A. §§ 3802(a)(1), 3802(c), and 3309(1), respectively.

[B]orough patrol vehicle. While on duty, Carpenter received a call from the Communications Center advising him that

> a Rob Steel had contacted and relayed information for a Mary Shipman, or a Mia Shipman, that there was a vehicle that was going to be traveling State Route 92, the Northeast Extension, down to Route 6 from a residence on State Route 92, the occupant of the vehicle, the driver of the vehicle, was drinking what they had called moonshine. The vehicle was going to be traveling to State Route 6 and then westbound to Tunkhannock Borough where it would then pick up the Southeast Extension of State Route 92 to travel to Rivercrest.

Carpenter was also told that the vehicle was a Chevy Trailblazer, blue in color, that the driver was intoxicated on moonshine, that there was a hunting rifle and an eleven (11) year old boy in the vehicle. After receiving the call, Carpenter proceeded to the Tunkhannock Borough, Tunkhannock Township line and parked in the parking lot of Ace Robbins Service Station. From this location, Carpenter was able to see vehicles traveling Route 6 coming westbound into the Borough and the split for the bypass to State Route [92].

> While parked at this location, Carpenter observed a blue Chevy Trailblazer traveling westbound on State Route 6. Carpenter then began to follow the vehicle at which time Carpenter observed the front and rear tires on the passenger side of the vehicle travel over the fog line and make an abrupt correction. Carpenter then observed the front and rear tires of the driver side of the vehicle travel over the double yellow lines in the center of the roadway and make another abrupt correction. At this point, Carpenter activated his emergency lighting motioning for the vehicle to stop. The vehicle eventually stopped on State Route 92 on the southbound berm.

Carpenter approached [Appellant]'s vehicle with caution because of the information that there was a possible riffle [sic] in the vehicle with a child. Upon approaching the vehicle, Carpenter observed that [Appellant] had glossy eyes, that [Appellant] was nervous and that there was an extremely strong odor of alcohol emanating from the vehicle. There was no child in the car. A rifle was not in [Appellant]'s immediate reach so Carpenter did not pursue the issue of a rifle. Upon speaking with [Appellant], Carpenter realized that the alcohol odor was coming from [Appellant]'s breath. [Appellant] told Carpenter that he had two (2) beers. As a result, Carpenter conducted field sobriety tests, namely, the horizontal gaze nystagmus, the nine-step walk[,] and a preliminary breath test. [Appellant] failed the nine-step walk and the result of the preliminary breath test was a 0.164. Carpenter then placed [Appellant] under arrest and [Appellant] was transported to Tyler Memorial Hospital for a blood draw for the offense. The blood was drawn from [Appellant][,] and [Appellant] had a Blood Alcohol Content of 0.224%.

A hearing was held on [Appellant]'s Pre-Trial Omnibus Motion that Carpenter did not have reasonable suspicion to stop [Appellant]'s vehicle on August 5, 2013. Said Motion was denied by Order dated August 7, 2013. A non-jury trial was held on October 24, 2013[,] and [Appellant] was found guilty of all four (4) charges as is reflected by th[e trial c]ourt's [o]rders dated October 24, 2013.

Trial Court Opinion, 2/4/14, at 1-4 (internal citations omitted).

On December 13, 2013, Appellant was sentenced to not less than 72 hours nor more than six months' imprisonment, followed by a period of probation for the remaining balance of whatever portion of Appellant's maximum sentence remains unserved upon parole, and a $1,500.00 fine for

DUI – general impairment. That same day, the trial court filed a second order sentencing Appellant to six months' probation for DUI – highest rate, to be served concurrently to the previous sentence. The trial court imposed no further penalty for the two counts of disregarding traffic lanes. On December 18, 2013, Appellant filed a timely post-sentence motion, which the trial court denied the same day. On January 16, 2014, Appellant filed a timely notice of appeal.[2]

On appeal, Appellant raises the following issue for our review.

> I. Whether, the officer who conducted the traffic stop that lead to the arrest of [] Appellant, had probable cause in which to perform a legal stop, and whether the evidence obtained from that stop should have been suppressed?

Appellant's Brief at 7.

We begin by noting our well-settled standard of review.

> [I]n addressing a challenge to a trial court's denial of a suppression motion [we are] limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the Commonwealth prevailed in the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

---

[2] Appellant and the trial court have complied with Pa.R.A.P. 1925.

*Commonwealth v. Washington*, 63 A.3d 797, 802 (Pa. Super. 2013) (some brackets and citation omitted).

The Fourth Amendment of the Federal Constitution and Article I, Section 8 of the Pennsylvania Constitution, protect individuals from unreasonable searches and seizures. "While warrantless seizures such as a vehicle stop are generally prohibited, they are permissible if they fall within one of a few well-delineated exceptions." *Commonwealth v. Brown*, 996 A.2d 473, 476 (Pa. 2010) (citation omitted). One such exception is where, "[a] police officer … has **reasonable suspicion** that a violation of the vehicle code has taken place, for the purpose of obtaining necessary information to enforce the provisions of the code." *Commonwealth v. Brown*, 64 A.3d 1101, 1105 (Pa. Super. 2013) (emphasis in original), *appeal denied*, 79 A.3d 1096 (Pa. 2013); *accord* 75 Pa.C.S.A. § 6308(b).

It is axiomatic that to establish reasonable suspicion, an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks and citation omitted). A suppression court is required to "take[] into account the totality of the circumstances—the whole picture." *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (internal quotation marks and citation omitted). When conducting a reasonable suspicion analysis, it is incumbent on the suppression court to inquire, based on all of the circumstances known to the officer *ex ante*, whether an

objective legal basis for the seizure was present. **Adams v. Williams**, 407 U.S. 143, 146 (1972).

Appellant's issue on appeal is limited to the argument that Officer Carpenter lacked probable cause to stop his vehicle on the basis of his violating Section 3309(1) of the Motor Vehicle Code, by crossing out of his lane of traffic twice. Appellant's Brief at 13-14. The Commonwealth counters that Officer Carpenter had reasonable suspicion to stop Appellant's vehicle on the basis of the call from the known informant, the specificity of that call, and Officer Carpenter's own observations of Appellant's vehicle after following it. Commonwealth's Brief at 4. Appellant is correct that our cases require probable cause to effectuate a traffic stop under Section 3309. **See generally Commonwealth v. Feczko**, 10 A.3d 1285, 1291-1292 (Pa. Super. 2010) (*en banc*), *appeal denied*, 25 A.3d 327 (Pa. 2011). However, as we discuss *infra*, we agree with the Commonwealth that Officer Carpenter did have reasonable suspicion of DUI to render the traffic stop in this case constitutional. Therefore, we need not decide whether Officer Carpenter separately had probable cause to stop Appellant's vehicle based on Section 3309(1).[3]

---

[3] As an appellate court, we may affirm the trial court on any legal basis supported by the record. **Commonwealth v. Charleston**, 16 A.3d 505, 529 n.6 (Pa. Super. 2011) (citation omitted), *appeal denied*, 30 A.3d 486 (Pa. 2011).

In this case, Officer Carpenter testified to the following facts, which led him to stop Appellant's vehicle.

> [Commonwealth]:
>
> Q:    OK, please draw your attention to December 1, 2012 at about 9:00 p.m.  OK, were you on duty?
>
> [Officer Carpenter]:
>
> A:    Yes, I was.
>
> …
>
> Q:    Ok, what happened … at that time while you were on duty?
>
> A:    My shift began at … approximately [9:00 p.m.] … I was dispatched by the Wyoming County Communication Center to assist Tunkhannock Township Police with an incident which had come into them.  The incident had come into Tunkhannock Township Police as they were busy with other incoming calls.  They had transferred it to State Police, Tunkhannock.  State Police was also busy with other calls coming in, a volume of other calls, so they had transferred it back to the Communications Center to give it to me.
>
> Q:    Ok, what were you told by the [Communication] Center?
>
> A:    I was advised … that a Steel, a Rob Steel, had contacted and relayed information for a Mary Shipman-or a Mia Shipman, that there was a vehicle that was going to be traveling the state route 92, the northeast extension down to route 6 from a residence on state route 92 and at that residence, the occupant of the vehicle, the driver of the vehicle, was drinking what they had called moonshine.  The vehicle was going to be traveling on state route 6 and then west bound to Tunkhannock Borough where

- 7 -

it would then pick up the southeast extension of state route 92 to travel to Rivercrest.

Q:     Were you told what vehicle the driver was driving?

A:     They described it blue in color, [a] Chevy [T]railblazer.

Q:     So when you got that call, what did you do?

A:     When I got the call, I traversed to the edge of the Tunkhannock Borough, Tunkhannock Township line, which is the eastern corner of Ace Robbins parking lot, where Sunny Side Road meets Route 6.

Q:     Where did you park there?

A:     I traversed to the far east corner of the parking lot and parked right at the entrance of the parking lot.

Q:     What vantage [point] did that vie you in terms of viewing the road?

A:     It's right on the borough township line and with that vantage [point], I can see vehicles traveling route 6 coming westbound into the borough and also that's where the split is for the bypass. Vehicles traveling westbound have the option to either travel directly into the borough or they can take the bypass towards state route 92 that way and where I was positioned, I was on the upper end of that intersection so where I … could actually see vehicles whichever way they traveled.

Q:     Ok, as you were waiting there, what happened as you were there?

A:     As I was sitting there, I observed that blue-color Chevy [T]railblazer, which was traveling westbound on state route 6.

…

Q:    Ok, what did you do then?

A:    The vehicle turned onto the bypass, state route 6, the bypass, and I pulled out immediately behind the vehicle and began to follow it.

Q:    OK, what did you observe?

A:    I observed the vehicle after I pulled out behind it to first travel over the fog line painted on the side of the road distinguishing the lanes used for travel. The vehicle traveled over the fog line, but what had caught my attention was the abrupt correction maneuver to bring it back into the correct lane of travel.

Q:    Ok, when you say the tires were over the fog line, was it the front and rear tire or just one of the tires went over the fog line?

A:    The front rear tires-in order to-

Q:    I'm sorry.  On one side-on the passenger side, was it the front and rear tire?

A:    Yes, front and rear tire on the passenger side.

…

Q:    What did the vehicle do next?

A:    The vehicle traveled a little bit further west towards the intersection.  Prior to it reaching the intersection, it again traveled over the lines, but this time, the double yellow lines painted in the center of the roadway distinguish the lanes used for travel.

Q:    How-what tires went over those lines?

A:    The driver[-]side tires went over the double yellow lines.

…

Q: What happened after that, after they went over the double yellow lines?

A: Again, what caught my attention was the abrupt correct back to the correct travel lane, the sudden maneuver to get back to the correct travel lane.

Q: What did the vehicle do next?

A: It approached the intersection of state route 92, the south extension and made the left hand turn onto state route 92 to begin travel south.

…

Q: Ok, and what happened next?

A: I activated the patrol vehicle's emergency lighting motioning for the vehicle to stop.

Q: And did you stop the vehicle?

A: I stopped the vehicle. After I activated the lighting, it traveled a little bit further and pulled off on the south berm of the route 92.

Q: And what time did you stop the vehicle?

A: I believe the documented time was [9:25 p.m.]

…

Q: Ok, so what was your-if you could summarize, what was your basis for stopping that vehicle?

A: The basis was the original call. The caller had left her information[,] so it wasn't an anonymous call. It was an actual complaint which we have an obligation to investigate. The detailed description that the caller had when she had contacted. There was also information in the call that there was an

> eleven-year-old boy in the car so the safety of that and that initiated the original call, which was have an obligation to investigate. After that, it was the observations of the driving and the totality of the circumstances of the call, the information received, obligation, and the vehicle code violations, which were observed.

N.T, 8/5/13, at 11-21.

The Commonwealth argued based on "the totality of the circumstances, [Officer Carpenter] had reasonable suspicion to stop [Appellant]'s vehicle." Commonwealth's Brief at 4.

> First, there was a complaint from a known individual who specifically accused [Appellant] of drinking alcohol and driving a vehicle. Second, the suspect vehicle was specifically identified in that complaint. Third, [Officer Carpenter] saw that same vehicle a short time later. Fourth, [Officer Carpenter] saw both the passenger and driver side tires veer completely out of the lane of travel, over the white fog lines and double yellow lines respectively and both involved an abrupt correction.

*Id.*

Our previous cases involving citizen tips about moving vehicles require specificity in terms of the quantity and quality of information in order to support reasonable suspicion. *Cf. Commonwealth v. Knotts*, 663 A.2d 216, 220 (Pa. Super. 1995) (officer lacked reasonable suspicion to stop vehicle matching make and model and color of vehicle involved in a hit and run 16 days earlier where the tip was anonymous and the officer testified that "she did not witness Knotts commit a violation of the Vehicle Code[]"). However, in this case, the information did not come from an anonymous tip

but from a known informant. The United States Supreme Court has previously explained that tips from known informants carry a higher degree of weight in a reasonable suspicion analysis. **See Florida v. J.L.**, 529 U.S. 266, 270 (2000) (stating, "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity[]"); **Adams**, **supra** (concluding that information from an informant that "an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist" who was "known to [the officer] personally and had provided him with information in the past" established reasonable suspicion).

In addition, Officer Carpenter personally observed Appellant's vehicle twice swerve out of its lane of traffic and then abruptly swerve back in. N.T., 8/5/13, at 15-17. This Court has previously explained that such observations may give rise to reasonable suspicion for a traffic stop. **See Commonwealth v. Fulton**, 921 A.2d 1239, 1243 (Pa. Super. 2007) (holding that officer's observations of defendant's vehicle "swerv[ing] out of his lane of travel three times in a mere 30 seconds, in dense fog, on a road shared by oncoming traffic" were sufficient for reasonable suspicion), *appeal denied*, 934 A.2d 72 (Pa. 2007); **Commonwealth v. Hughes**, 908 A.2d 924, 927-928 (Pa. Super. 2006) (holding that officer's observations of the defendant's "vehicle … swerving across the divided line into the other lane …

[and] follow[ing] [the defendant] for less than a mile and observ[ing] him commit the same traffic violation at least twice" were sufficient for reasonable suspicion of DUI).

In this case, Officer Carpenter received a tip from a known informant that identified a specific make, model, and color vehicle travelling on a specific road, alleging that the driver had been drinking moonshine and was driving with an 11-year-old in the car. N.T., 8/5/13, at 12-13, 21. Officer Carpenter observed this same make, model, and color vehicle drive at the specified location. *Id.* at 14-15. Officer Carpenter followed the vehicle and personally observed the vehicle swerve in and out of its lane of travel twice. *Id.* at 15-17. In our view, these factors, in their totality, gave Officer Carpenter the required level of reasonable suspicion of DUI to render the traffic stop of Appellant's vehicle constitutional. *See J.L.*, *supra*; *Adams*, *supra*; *Fulton*, *supra*; *Hughes*, *supra*. As a result, we conclude the trial court properly denied Appellant's motion to suppress. *See Washington*, *supra*.

Based on the foregoing, we conclude Appellant's sole issue on appeal is devoid of merit. Accordingly, the trial court's December 13, 2013 judgment of sentence is affirmed.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/10/2014